DENNIS R. BAGNERIS, SR., Judge.
| t Plaintiffs/appellants, S & R Properties Investments and American Empire Surplus Lines Insurance Company, appeal the judgment in favor of defendant/appellee, Fellowship Missionary Baptist Church, finding that the church was not liable for a fire that resulted in damages to S & R’s property and the property of American Empire’s insured. We find that the judgment was not manifestly erroneous or clearly wrong. Accordingly, the judgment is affirmed.
FACTS/PROCEDURAL HISTORY
The New Orleans Fire Department was called on January 7, 2011, to suppress a fire at property owned by the Fellowship Missionary Baptist Church (hereinafter, FMBC or “the church”). The property encompassed the church building located at 2101 Prytania Street and a residential house located at 2113 Prytania Street. FMBC had not conducted worship services on the property since the church was damaged by Hurricane Katrina in 2005.
li>The New Orleans Fire Department, the State Fire Marshall’s Office, and the Bureau of Alcohol, Tobacco, and Firearms investigated the fire. All agencies agreed that the cause or the origin of the fire could not be conclusively determined.
Notwithstanding efforts to contain the fire, S & R and American Empire’s insured, Show and Tell of New Orleans, L.L.C., sustained water and fire damages to their nearby properties, along with the owners of the Magnolia Mansion. S & R, American Empire, as the subrogated property insurer of Show and Tell, and the owners of the Magnolia Mansion filed complaints against FMBC.[1] The aggregate complaints essentially claimed that FMBC was negligent for its alleged inattentiveness in maintaining its property in a safe and secure manner and its alleged failure to adequately secure the church to prevent vagrants, who the complainants claimed caused the fire, from habitually entering and inhabiting the church. The complaints also contended that the building had been in a state of disrepair; that the property had been adjudged a public nuisance; and had been cited as blighted property by the City of New Orleans in September and November of 2009.
The parties agreed to a bi-ficurated jury trial on the issues of liability and damages. Trial commenced as to liability only on July 28, 2014.[2] A summary of pertinent trial testimony included the following:
[ ^Raymond Washington, an inspector with the New Orleans Fire Department, investigated the fire. He testified that the cause and the origin of the fire were undetermined. Inspector Washington confirmed that fire investigators from the Louisiana State Fire Marshall’s Office and the Bureau of Alcohol, Tobacco, and Fire *1139 arms, also reached the same conclusion. He was unable to substantiate any statements that vagrants had been inside the church. None of the witnesses he spoke to reported seeing persons entering or leaving the church at the time of the fee.
John Gauthier, the innkeeper at the neighboring Henry Howard House, testified regarding two occasions when he had entered the church. The first time he accessed the church, he entered through an opening in a door on the main floor. He saw clothes, food wrappers, and empty beer bottles — which indicated to him that homeless people had been inside the church. The second time he entered the church, he was with Myrna Keys, the church’s real estate agent. This entry happened approximately a year before the fee. He conceded that on this second entry, the opening he had previously gone through had been secured. Mr. Gauthier also admitted that since the second entry, he never again saw anyone enter the church building. Mr. Gauthier did not see anyone leaving the church’s premises on the night of the fire.
Pinar Aiptunaer, a frequent Henry Howard House guest, testified that homeless people could squeeze through a back gate to enter the church’s property. She believed that the church had a missing window located above its back door |4and that milk crates were positioned below this missing window. She surmised that homeless persons used these crates to gain entry inside the church. On cross-examination, she admitted that she never saw vagrants or the homeless inside the church nor did she see them break into the church. Ms. Aiptunaer also never actually saw anyone use the milk crates to enter the church through the alleged missing window. Ms. Aiptunaer was not in town at the time of the fee.
Myrna Keys, the church’s real estate agent, frequently showed the church over the years. She testified that when the property was first listed in 2008, she received calls that unauthorized persons were getting into the church building. She added, however, that church members quickly responded and took care of the problems she identified. Ms. Keys maintained that by mid-2009, the building was totally secured. In particular, she did not receive any more calls from anyone at Henry Howard House regarding unauthorized entries. Ms. Keys testified that she saw no evidence of people being able to enter the church for about a year and a half before the fire.
The video-taped deposition of Matt Pa-tin, a retired police officer who worked at Henry Howard House, was introduced into evidence. Mr. Patín said he had called the police to have vagrants removed from outside the church’s premises sometime in early December 2010. He did not see any more vagrants outside the property after that time.
Mr. Patín testified that he saw the fire. He said he saw flames coming simultaneously from the church as well as a dumpster that was located on S & R’s | Bproperty. Mr. Patín did not observe any vagrants entering or leaving the church or its property on the evening of the fee.
The plaintiffs’ fire sciences consultant expert, George Casellas, opened his investigation on June 12, 2012, about a year and a half after the fire. He stated that a triangle of fuel, oxygen, and ignition is needed to start a fire. Mr. Casellas explained that the wooden pews, books, and paper inside the church created a large fuel source; and that a hole in the church steeple provided the oxygen. He added that because the church lacked environmental controls as its utilities had been shut-off, the wood within the church would be drier, which would make a fee burn with greater intensity. Mr. Casellas ac *1140 knowledged that the ignition source was unknown. However, he said the fire was probably caused by human intervention and that the likely source was vagrants based on reports he read that vagrants had previously been observed on the church’s premises. Mr. Casellas did not believe that flames came from the dumpster. He theorized that Matt Patín, who saw flames in the S & R dumpster, may have mistaken the flames for reflections that came from the church’s stained glass windows.
On cross-examination, Mr. Casellas admitted that he had no physical evidence that vagrants started the' fire and that none of the reports he reviewed actually placed vagrants inside the church around the time of the fire. He also agreed that the wooden pews within the church were no different than wood inside similar structures, such as other churches and courthouses. Mr. Casellas also conceded that he did not physically examine the dumpster or conduct any tests to ^support his theories as to the fire’s cause or origin arid that no fire code provision required the church to have environmental controls.
Donald Horaist, the plaintiffs’ other fire expert, was retained to give an opinion as to whether the fire originated in the dumpster. He ruled out that the fire started within the dumpster because he did not see oxidation or a blistering pattern on the paint inside the dumpster to indicate it was the origin of the fire. However, on cross-examination, he acknowledged that he did not examine the dumpster until sixteen months after the fire; and that any evidence would have degraded given the passage of time.
The plaintiffs introduced into evidence September 2009 and November 2009 judgments made against the church property for being a “trashed” property and blighted property. To explain those judgments, the plaintiffs called Winston Reid, a deputy director with the City of New Orleans Office of Code Enforcement. He testified as to the process the City employed to cite property owners for code violations and provide notice of hearings. In general, he said the citation would be posted on the outside of the building. A notice of the hearing would be posted before the hearing; and after the hearing, a second notice would be posted. In this instance, the judgments specifically related to the residential house located at 2113 Prytania. Mr. Reid acknowledged that the address on both judgments was for a General Taylor Street address. He could not say whether phone contact was made with any church representative or the church’s pastor regarding the judgments.
IvReverend Moses Gordon, the church’s pastor, acknowledged that worship services had not been conducted at the church post-Katrina because the building was structurally unsafe. Rev. Gordon testified that Gene Harrington and other church members were responsible for securing the church premises. He knew that scaffolding had been installed to prevent the walls from collapsing; that broken windows were covered with tarps and that the building was boarded up. Rev. Gordon denied knowledge of any judgments the City issued in 2009 against the property. Rev. Gordon testified that he saw homeless persons outside the church property from time to time; however, he never saw such persons inside the church building.
Gene Harrington, a church member, testified that he volunteered to oversee the church property after Hurricane Katrina. He said that Tyrone Vincent, the church’s building superintendent, and Thurman Cooley, a deacon with the church, assisted him in securing the building. They installed scaffolding; placed tarps on broken windows; braced and placed deadlocks on the door; and installed burglar bars. Mr. Harrington said he went to the property *1141 about two or three times per week. He acknowledged that he had seen homeless persons sleep outside the church. However, he was unaware of any break-ins and did not see any unauthorized persons inside the church. Mr. Harrington also did not see any notices posted on the church from the City or the New Orleans Fire Department.
Thurman Cooley testified that he hung tarps on the windows and secured the doors on the Prytania Street entrance. He acknowledged that he was once called |sby the realtor to check on a door that was openéd; however, he said the burglar bars still prevented entry into the church. Mr. Cooley often drove by to check on the church. He never saw where anyone had damaged the burglar bars on the doors or the windows. Mr. Cooley did not receive any calls about unauthorized persons within the church. Based on his knowledge, the church was secured in the six months before the fire.
Tyrone Vincent verified that he worked with Mr. Harrington and Mr. Cooely to secure the church. He testified that the stained glass windows, which had been covered with tarps, were not accessible from the ground floor level. He added that he never saw the tarps on the windows torn or broken. He said the iron bars were secured and remained on the door even after the fire. Mr. Vincent never saw any indication that anyone had broken into the church.
Fred Henry Vanderbrook, the church’s expert, testified that the cause and the origin of the fire were unknown. Although he agreed that the fire likely resulted from human intervention, he said he could not say whether the fire was set intentionally or accidentally. Mr. Vanderbrook could not rule out the possibility that the fires started in the dumpster based on the testimony of Mr. Patín. He also stated the condition of the church, in particular the wooden pews; its lack of air-conditioning, and the small hole in the church steeple, did not create a fire hazard.
Prior to the case being sent to the jury, the plaintiffs requested jury instructions based on Mistretta v. Fiorella.[3] In Mistretta, the appellate court found 19that the owner’s failure to keep the house secure was a cause-in-fact of the fire that was reasonably proven to have been ignited by vagrants or children. The opinion referenced Code of the City of New Orleans (Ord. No. 828 M.C.S.) § 11-26. The ordinance provided that: “[T]he owners of a vacant house shall keep the doors and other entrances to such house so closed as to prevent the ingress therein by tramps or individuals not regularly occupying such house.” Mistretta reasoned that the ordinance’s purpose in securing vacant houses against tramps, etc., encompassed protection against dangers which included that unauthorized visitors might cause a fire. Mistretta, at 590. Accordingly, plaintiffs argued that a specific instruction from Mistretta was needed to explain the scope of the duty and the foreseeable risks imposed by present-day ordinances, New Orleans Municipal Ordinances §§ 26-156(c) and 26-444.[4] The trial court instructed *1142 the jury on these ordinances; however, it denied the plaintiffs’ request for a Mistret-ta jury instruction.
The plaintiffs also requested a jury instruction on the doctrine of res ipsa loqui-tur. They averred that the res judicata jury instruction was appropriate because only circumstantial evidence existed to prove what they claimed was the only logical cause of the fire-the church’s negligence for its alleged failure to 11(1secure its premises which allowed unauthorized persons to enter and start the fire. The trial court rejected the proposed res ipsa loqui-tur jury instruction.
After jury deliberations, the trial court rendered judgment in favor of FMBC. In the first jury interrogatory, the jury answered “no” when asked whether a defect in the church’s premises created an unreasonable risk of harm.
The plaintiffs- then filed a motion notwithstanding the verdict and/or alternative motion for new trial based on newly discovered evidence. Their motion notwithstanding the verdict centered on their claim that the jury’s finding of no defect was unreasonable considering the evidence. The new trial motion represented that recently discovered photographs showed blight and nuisance citations posted on the church’s property some time in 2009. They contended these photographs arguably contradicted the testimony of Rev. Gordon and other church members who denied knowledge of such postings. The trial court denied the motions. It opined that reasonable and fair-minded people could have reached the jury verdict; that the so-called newly discovered evidence was discoverable before trial; and that good grounds did not exist for a new trial.
Thereafter, this appeal was timely lodged by S & R and American Empire (hereinafter, collectively, S & R).[5]
LAW/DISCUSSION
S & R’s assignments of error maintain that 1) the jury’s finding that defendant’s premises did not have a defect which created an unreasonable risk of |nharm was manifestly erroneous; 2) the trial judge’s failure to instruct the jury about Mistretta v. Fiorella as to its application to the New Orleans Code of Ordinances at issue in the present matter constituted reversible error; 3) the trial judge’s failure to instruct the jury regarding the doctrine of res ipsa loquitur was reversible error; and 4) the trial court erred in its denial of the Motion Notwithstanding the Verdict or Alternatively, Motion for New Trial.

STANDARD OF REVIEW

Appellate courts apply the manifest error/clearly wrong standard of review in reviewing the trier of fact factual findings. See Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. The jury’s findings can only be disturbed if they are clearly wrong or manifestly erroneous; appellate courts must give great weight to the factual conclusions of the trier of fact, preserving the jury’s credibility evaluations and inference of fact. Stobart v. State through Dept. of Transp. & Dev., 617 So.2d 880, 882-83 (La.1993). “Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, the [factfin-der’s] reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.” Id. at 882. The issue to be decided “by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one.” *1143 Id. at 882. Hence, in order to reverse the factfinder, an appellate court must find 1) that a reasonable factual basis does not exist for the finding of the trier of fact; and 2) that the record establishes the | ^finding is clearly wrong. See Scarberry v. Entergy Corp., 13-0214, p. 16 (La.App. 4 Cir. 2/19/14), 136 So.3d 194, 207, quoting Harold A. Asher, CPA, LLC v. Haik, 12-0771, p. 4 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 723-724).
We first apply these precepts in considering S & R’s claim that the jury erred in its finding that FMBC’s premises did not have a defect which created an unreasonable risk of harm.

DEFECTIUNREASONABLE RISK OF HARM

S & R supports its claim that the church building was defective in allowing vagrants to enter by noting the testimony of Mr. Gauthier and Ms. Alptunaer who said they saw vagrants/homeless persons outside the church property; and in the case of Mr. Gauthier, evidence that vagrants were inside the church. S & R references Rev. Gordon’s testimony that the church was no longer safe for worship services, its fire expert’s testimony that the church’s wooden pews and a hole in the roof created a fire hazard; and the blight citations to argue that the church was defective because it was structurally unsound.
To counter, FMBC cites Myrna Keys’ testimony that the church was totally secured and there were no problems with unauthorized entries/break-ins for about six months to a year before the fire. FMBC argues that testimony from Rev. Gordon, Gene Harrington, Thurman Cooley, and Tyrone Vincent, show the church took appropriate steps to physically secure the building to prevent entries by vagrants, namely, the installation of burglar bars, braces, tarps, and deadlocks. FMBC also notes that although defense witnesses allegedly saw vagrants and/or |1shomeless persons outside the church property, none saw unauthorized persons within the church itself for approximately a year before the fire. Moreover, none saw unauthorized persons entering or leaving the church on the evening of the fire. Moreover, FMBC avers that its expert, Mr. Vanderbrook, rebutted claims that the wooden pews or the overall structural condition of the church prior to the fire posed a fire hazard that created and/or contributed to the cause of the fire. FMBC iterates that scaffolding was installed; that the building never collapsed prior to the fire; and no evidence established any causal connection between the blight judgments and the fire to debunk S & R’s claim that the church was defective because it was unsafe.
“[Wjhere two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” Stobart, 617 So.2d at 883. In this case, the jury apparently accredited the testimony of defense witnesses over that of plaintiffs’ witnesses and accepted the defense’ view of the evidence. Based upon óur review of the record, the jury’s finding that the church did not have a defect that created an unreasonable risk of harm was a reasonable one, supported by the record. Accordingly, this assignment of error lacks merit.

JURY INSTRUCTIONS

S & R’s next assignments of error contend that the trial court erred in failing to provide certain jury instructions based on Mistretta v. Fiorella, infra, and the doctrine of res ipsa loquitur.
| u“Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of law for the jury to apply to those issues.” Adams v. Rhodia, 07-2110, p. 6 *1144 (La.5/21/08), 983 So.2d 798, 804. In reviewing jury instructions, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Id., 07-2110, p. 7, 983 So.2d at 804.
We now turn our review to whether the trial court erred in denying S & R’s proposed Mistretta v. Fiorella and res ipsa loquitur jury instructions.
A. ' Mistretta v. Fiorella
S & R suggests that the trial court should have given a Mistretta jury charge because the facts of the present matter are analogous to Mistretta’s facts; and the proposed instruction would have assisted the jury in its interpretation of New Orleans Code Ordinances sections 26-156(c) and 26-144, the ordinances which place a duty on owners to maintain their property in a secure fashion to prevent unauthorized entry. However, S & R disregards that Mistretta is clearly distinguishable from the facts of the instant matter. In Mistretta, a violation of the applicable ordinance was factually determined to be the cause of the fire. Here, no determination was made as to the cause and origin of the fire. Moreover, the defendant’s expert could not rule out whether or not the fire started in S & R’s dumpster.
“Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions.” Adams, 07-2110, p. 6, 983 So.2d at 804; see also Scarberry, 13-0214, p. 12, 136 So.3d at 205. “Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed soj^long as the charge correctly states the substance of the law”; only after appellate courts find that an instruction was erroneous and that it likely contributed to the verdict are they authorized to review the facts of a case de novo. Adams, 07-2110, pp. 6-8, 983 So.2d at 804-805.
The trial court in this matter provided the jury with the relevant code ordinances that stated the substance of the law regarding the property owner’s duty to secure his properties from unauthorized entries. We find these instructions properly reflected the law as it pertained to the facts of this case. S & R was not entitled to the Mistretta jury instruction because no factual finding was ever made that the fire resulted from unauthorized persons within the church or that the church was unsecured. Notwithstanding, S & R was able to provide its interpretation of these ordinances in its closing argument to the jury. The lack of the Mistretta jury instruction did not mislead the jury or prevent the jury from dispensing justice. Accordingly, this assignment of error is without merit.
We now consider S & R’s claim that the trial court erred in not instructing the jury on the doctrine of res ipsa loquitur.
B. Res Ipsa Loquitur
The doctrine of res ipsa loquitur is discussed in in Linnear v. CenterPoint Energy Entex/Reliant Energy.[6] The decision explains that the doctrine applies in cases where the plaintiff uses circumstantial evidence alone to prove negligence by the defendant. Id. It does not apply “if there is sufficient direct evidence explaining the occurrence and establishing the details of the negligence charged.” Id., 06-3030, p. 7, 966 So.2d at 42 (quoting Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1048 (La.1979)).
|1fiS & R maintains that all the elements for application of res ipsa loquitur are present in the instant case. They include: *1145 1) the injury is the kind which ordinarily does not occur in the absence of negligence; 2) the evidence sufficiently eliminates other more probable causes of the injury, such as the conduct of the plaintiff or a third person; and 3) the negligence of the defendant falls within the scope of the duty owed to the plaintiff.[7] We. disagree.
First, we note that S & R presented both direct and circumstantial evidence in support of its negligence claim that the building was unsecured and was unreasonably dangerous. It relied on direct evidence from witnesses, such as Mr. Gauthier and Ms. Alptunaer, who claimed they saw that the building was left unsecured to allow vagrants to enter. Its expert, Mr. Casellas presented his opinion that the church was a fire hazard. However, the church countered with competing direct evidence from its witnesses who claimed the church was properly secured and that unauthorized persons did not enter the church near the time of the fire. Similarly, the church cited testimony from its expert, Mr. Vanderbrook, who concluded the church was not a fire hazard, was not unsafe, and did not rule out the possibility that the fire started in S & R’s dumpster or resulted from arson.
.Primarily, however, the evidence does not establish the church’s negligence. It is uncontroverted that the cause and origin of the fire were unknown. Possible origins of the fire-such as the dumpster — and causes of the fire, such as arson, are too numerous to apply the doctrine of res ipsa loquitur. Accordingly, S & R does |17not meet res ipsa loquitur’s requirement that the circumstantial evidence conclusively points to the defendant’s negligence.
Reasonable minds could not conclude that all three criteria for the use of res ipsa loquitur were met in this matter. Therefore, the trial court properly did not offer jury instructions on the doctrine.

JUDGMENT NOTWITHSTANDING THE VERDICT AND/OR ALTERNATIVELY, MOTION FOR NEW TRIAL

S & R’s final assignments of error contend that the trial court erred in denying its judgment notwithstanding the verdict (JNOV) and/or alternatively, motion for a new trial. S & R reiterates that it was entitled to a judgment notwithstanding the verdict or alternatively, motion for new trial because the verdict was clearly contrary to the law and evidence. It argues that the evidence clearly established FMBC’s liability for the fire. S & R suggests that new evidence it discovered post-trial, that was “important to the cause” and which could not have been discovered without due diligence, entitled it to a new trial.
La.Code of Civil Procedure art. 1811(F) provides the authority for a JNOV.[8] A judgment notwithstanding the verdict is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. Anderson v. New Orleans Pub. Serv. Inc., 583 So.2d 829, 832 (La.1991). “In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.” Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4 (La.1811/28/00), 774 So.2d 84, 89 (quoting Smith v. Davill Petroleum Company, Inc. d/b/a Piggly Wiggly, 97-1596 (La.App. 1 Cir. 12/9/98), 744 So.2d 23).
Appellate review of a denial of a motion for new trial is subject to an abuse of *1146 discretion standard. Anthony v. Davis Lumber, 629 So.2d 329, 331 (La.1993). The ruling on a motion for new trial requires the appellate court to balance two concepts: the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial. Davis, 00-0445, p. 11, 774 So.2d at 93-94. The trial court may evaluate the evidence without favoring either party; may draw its own inferences; and evaluate the credibility of witnesses. Joseph v. Broussard Rice Mill, 00-0628, pp. 14-15 (La.10/30/00), 772 So.2d 94, 104. However, the “scales are tilted in favor of the survival of the jury’s verdict.” Martin v. Heritage Manor South Nursing Home, 00-1023, pp. 6-7 (La.4/3/01), 784 So.2d 627, 623.
With reference to S & R’s claim that the verdict was contrary to law, this Court has already determined that the evidence was sufficient for the jury to conclude that the church’s premises were not defective so as to create an unreasonable danger of harm. Accordingly, we find no abuse of the trial court’s discretion in denying S & R’s motion for JNOY or alternatively, motion for a new trial.
Similarly, the trial court did not abuse its discretion in denying S & R’s motion for new trial based on newly discovered evidence. This motion resulted from photographs S & R contends were discovered post-trial. The photographs and supporting affidavits purportedly proved that blight notices had been posted on the church’s premises. As a result, S & R claimed that this new evidence rebutted the 11stestimony of Rev. Gordon and other church members who claimed no knowledge of such notices.
A party seeking a new trial on the basis of newly discovered evidence must demonstrate that “it has done all that is reasonable to lead to timely discovery of the evidence.” McGhee v. Wallace Drennan, Inc., 04-0950, p. 10 (La.App. Cir.4/20/05), 904 So.2d 3, 9 (citing Barker v. Rust Engineering Co., 428 So.2d 391 (La.1983)). Newly discovered evidence justifies a new trial only if evidence: 1) is discovered after trial; 2) [the evidence] could not, with due diligence, have been discovered before or during the trial; and 3) is not merely cumulative, but instead would tend to change the results of the case. The Grill Holdings, L.L.C. v. Camelia Grill Holdings, Inc., 12-1642, p. 5 (La.App. 4 Cir. 5/8/13), 120 So.3d 294, 298.
The record reveals that the issue of the blight citation notices was raised in S & R’s original petition for damages; hence, evidence relative to the church’s knowledge of these notices presented itself before trial, and was certainly discoverable prior to trial. In particular, the judgments related to the blight citations had been admitted into evidence. In denying the motion for new trial, the trial court found that S & R provided no legitimate reasons as to why this “newly discovered” evidence could not have been discovered with “due diligence” before the. trial on the merits. It rejected S & R’s reason that the evidence was not discoverable because S & R could not have anticipated Rev. Gordon’s testimony that the church property and the residential house property were separate. This Court finds no error with the conclusions reached by the trial court.
Moreover, based upon our review, S & R also does not show how this evidence, if admitted, would have changed the trial’s outcome. In particular, no evidence was offered to establish that the blight citations meant the property | ^created an unreasonable risk of harm; that the property was still in “blighted” status at the time of the fire; or that the fire emanated from *1147 any condition which resulted in the blight citations. Instead, the un-contradicted evidence showed that the cause and origin of this fire were unknown. Accordingly, we find the trial court did not abuse its discretion in denying S & R’s motion for new trial/judgment notwithstanding the verdict.
CONCLUSION
Based on the foregoing reasons, the judgment of the trial court is affirmed.
JUDGMENT AFFIRMED

. These complaints-S & R Property Investments, LLC v. Fellowship Missionary Baptist Church, CDC# 2011-00890; American Empire Surplus Lines Ins. Co. v. Fellowship Missionary Baptist Church, CDC #2012-00130; and Hollie Vest, et al. v. Fellowship Missionary Baptist Church, CDC # 2011-07049, were consolidated with the Show & Tell, LLC d/b/a Henry Howard House v. Fellowship Missionary Baptist Church and First NBC Bank, CDC # 2011-00481 petition.

. Show & Tell dismissed its claims with prejudice before trial.

. 269 So.2d 589 (La.App. 4 Cir. 1972).

. NEW ORLEANS, LA, CODE OF ORDINANCES, ch. 26, art. IV, div. 4, § 26-156(c) (2013) (eff. Sept. 1, 2013) provides: "All vacant structures and premises thereof or vacant land shall be maintained in a clean, safe, secure and sanitary condition as provided in this division so as not to adversely affect the public health or safety.”
NEW ORLEANS, LA, CODE OF ODI-NANCES, ch. 26, art. VI, § 26-444 (1956) provides, in pertinent part: "It shall be the responsibility of the owner and/or agent of the owner of any vacant structure or building to maintain such vacant structure or building so secured and in such condition that ingress into the structure or building by unauthorized persons is prevented ...”

. The Vest plaintiffs chose not to appeal the adverse verdict.

. See generally, 06-3030 (La.9/5/07), 966 So.2d 36, 42.

. Cangelosi v. Our Lady of the Lake Reg'l. Med. Ctr., 564 So.2d 654, 665 (La.1989).

. La. C.C.P. art. 1811(F) provides: “The motion for a judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both issues.”